IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

RONDA SCOTT,

          Plaintiff,

v.

RITE AID OF GEORGIA, INC.,[1]

          Defendant.

Civil Action 7:11-CV-180 (HL)

## ORDER

This case is before the Court on Defendant's Motion for Summary
Judgment (Doc. 28). After consideration of the briefs, affidavits, depositions, and
other materials submitted, the Court grants Defendant's motion.

## I.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be
granted "if the movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.
56(a). "The moving party bears 'the initial responsibility of informing the . . . court
of the basis for its motion, and identifying those portions of the pleadings,

---

[1] The parties dispute who the proper defendant is in this case. Plaintiff contends it is
Rite Aid of Georgia, Inc. Defendant contends it is Eckerd Corporation d/b/a Rite Aid.
The Court is not certain why this issue could not be decisively resolved during
discovery. In any event, Plaintiff is not entitled to any of the relief requested, whether it
be from Rite Aid of Georgia, Inc. or Eckerd Corporation d/b/a Rite Aid. It bears noting
that Defendant did not timely file its response to Plaintiff's statement regarding the
proper defendant, as the response was not filed by noon on January 11, 2013 as
ordered by the Court.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Trial Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986))."If

the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

In accordance with Local Rule 56, Defendant filed a statement of material facts to which it contends there is no genuine dispute. (Doc. 30). As required by Local Rule 56, each fact statement is supported by a specific citation to the record. *See* M.D. Ga. L.R. 56. Plaintiff was required to respond to each of Defendant's fact statements. <u>Id.</u> She did not file any such response or specifically controvert Defendant's facts by specific citation to the record. Instead, she merely included her own statement of material facts that did not correspond with or respond to any of the numbered paragraphs provided in Defendant's statement. Therefore, in accordance with Local Rule 56, the facts in Defendant's statement of material facts are deemed admitted. <u>Id.</u>

Even though Defendant's submitted facts are deemed admitted, Defendant "continues to shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged." <u>Reese v. Herbert</u>, 527 F.3d 1253, 1268 (11th Cir. 2008). The Court must "review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." <u>Id.</u> at 1269 (quotation and internal quotation marks omitted). The Court has so

reviewed the record, and viewed in the light most favorable to Plaintiff, finds the facts for purposes of summary judgment to be as follows.[2]

Plaintiff received a bachelor of science degree in pharmacy in 1988 and a doctor of pharmacy degree in 1989. Plaintiff began working for Rite Aid as a staff pharmacist in 2000. She was promoted to a pharmacy manager position shortly thereafter at a Rite Aid store in Waycross. Plaintiff left this position in 2002 for another job.

In November of 2006, Plaintiff re-applied with the company for a staff pharmacist position at Store 11852, located at 1905 North Ashley Street, Valdosta, Georgia. Plaintiff was interviewed for the position and subsequently hired. Plaintiff's direct supervisor was Pharmacy District Manager Cindy Woolfolk. Woolfolk promoted Plaintiff to pharmacy manager at the Ashley Street store in September of 2007. As pharmacy manager, Plaintiff's responsibilities included overseeing pharmacy operations, supervising ancillary support

---

[2] To the extent they do not conflict with the admitted facts contained in Defendant's statement of material facts, the Court will consider Plaintiff's asserted undisputed material facts and Defendant's response to the same as it normally does in a summary judgment context. The Court will, however, disregard the statements in the form of issues or legal conclusions contained therein. For example, "Defendant Rite Aid of Georgia, Inc. engaged in policies and practices which willfully, intentionally and unlawfully discriminated against the Plaintiff on the basis of her race and sex" and "The Defendant's conduct in not promoting the Plaintiff violated Title VII of the 1964 Civil Rights Act as amended" are not a statements of material fact. (*See* ¶¶ 28, 30, 36). In addition, a number of Plaintiff's asserted facts simply have nothing to do with the claims in this case. For instance, Plaintiff assisting Anthony Hunter with new hire pharmacy computer procedures (¶ 8) and the fact she acted as a preceptor for pharmacy students (¶ 10) are immaterial to Plaintiff's discrimination claims. The purpose of the statement of undisputed material facts is to allow the parties and the Court to efficiently and clearly identify any factual disputes. The inclusion of immaterial and irrelevant facts does nothing more than waste the parties' and the Court's time.

(pharmacy cashiers and technicians and staff and floater pharmacists), providing patient counseling, meeting performance and customer focus metrics, pharmacy compliance, and inventory management and control.

Defendant uses several metrics to evaluate the performance of each pharmacy. These include the number of prescription sales, growth in the number of prescription sales over time, Customer Service Index, Key Performance Indicators, and Overall Customer Satisfaction. The Customer Service Index measures customer satisfaction through surveys. The company requires a minimum Customer Service Index score of 75%, and Plaintiff's store fell below that threshold. In addition, Plaintiff's Overall Customer Satisfaction scores for the time period from February 2009 to July 2010 were generally average or below average.[3] Further, the Ashley Street store was ranked 26th in sales volume out of 27 stores in the district. Plaintiff could not recall her Key Performance Indicator scores while at the Ashley Street location.[4] Plaintiff blames the poor store performance on the demographics of the area and a lack of permanent staff.

Plaintiff became interested in becoming a Pharmacy District Manager ("PDM"). She expressed her interest in her annual self-evaluations for fiscal

---

[3] Plaintiff's Overall Customer Satisfaction scores were as follows: February 2009 - 43%; March 2009 - 57%; April 2009 - 70%; May 2009 - 53%; June 2009 - 54%; July 2009 - 75%; August 2009 - 63%; September 2009 - 71%; October 2009 - 75%; November 2009 - 33%; December 2009 - 41%; January 2010 - 57%; February 2010 - 64%; March 2010 - 42%; April 2010 - 60%; May 2010 - 75%; June 2010 - 77%; July 2010 - 75%

[4] Key Performance Indicators measure the quality assurance of prescriptions.

years 2008 and 2009. Plaintiff also spoke with Cindy Woolfolk and Larry Weed about her desire to become a PDM.

Pharmacy District Managers are responsible for directing the pharmacy operations in multiple stores in a district to operate in an efficient manner, adhering to company policies, procedures, and programs that maximize potential sales, prescription growth, margin, and profitability, among other duties. Pharmacy District Managers are also responsible for supervising all of the pharmacists and pharmacy managers within their district and helping those pharmacy managers meet and exceed all of their performance metrics. Because pharmacy performance metrics are so important, Defendant tries to recruit PDMs who have either demonstrated that they grasp the metrics and have excelled at them, or otherwise demonstrate a strong business acumen and leadership skills which Defendant believes will lead to success in the role. A pharmacy degree is not required for the PDM position, and non-pharmacists have successfully served in the position in the past.

Defendant usually posts openings for PDMs internally first in an effort to hire from within. However, if a viable internal candidate cannot be identified, the positions are posted externally. In 2009, the company's openings would have been posted internally through SYSMS, which is a form of email. A message would be sent out notifying associates that there was a PDM position open and that interested candidates should apply. Generally, if an internal candidate applies for a PDM position, a company talent manager confers with the

applicant's direct supervisor to find out whether the supervisor recommends the applicant for the position or whether the supervisor feels the applicant is a viable candidate.[5] Once the talent manager identifies potentially viable candidates from the initial applicant pool, he recommends those applicants to the Regional Pharmacy Vice President for further review and interviews. If the Regional Pharmacy Vice President selects a candidate, the candidate is then interviewed by a Senior Vice President and the Director of Human Resources for final approval.

As noted above, Cindy Woolfolk was Plaintiff's PDM when Plaintiff re-joined the company in 2006. Woolfolk was later transferred to another position within the company, and in March 2008, Larry Weed replaced Woolfolk as Plaintiff's PDM. In early 2009, Chip Stewart replaced Weed as the PDM for Plaintiff's district.

In January 2009, Tammy Rogers became the Regional Pharmacy Vice President for the Southeast Region. Chip Stewart left the PDM position, and in March 2009, Dominic Torchia, a white male, replaced Stewart as the Southwest District PDM and became Plaintiff's supervisor. Torchia was selected by Tammy Rogers for the position and was approved by the Director of Human Resources and Senior Vice President. Torchia is a licensed pharmacist. He has a bachelor's of pharmacy degree and a master's degree in science education. Prior to working

---

[5] A talent manager is responsible for recruiting candidates as needed for various positions with the company.

for Rite Aid, Torchia worked for several years as a PDM for CVS and Revco. He worked in Rite Aid's acquisitions department immediately before taking the PDM position, and assumed the management position after the acquisitions department closed. The PDM position filled by Torchia was never posted for applications.

In June 2009, Plaintiff applied for a PDM position in the Northwest District. Cathy Hugues was the company talent manager in charge of the application process for this position. After receiving Plaintiff's application, Hugues advised Plaintiff that the next step in the process was to submit a recommendation from her PDM, Dominic Torchia. Plaintiff told Hugues that Torchia had only supervised her for a brief period of time and therefore would be unable to provide a recommendation. Plaintiff asked that Hugues speak with Woolfolk, who had supervised her for a longer time. Hugues spoke to Torchia anyway and told him that two associates in his district had applied for the position. She asked if he thought they were viable candidates. With respect to Plaintiff, Torchia stated that he had only been in the district briefly but based on the interactions he had with Plaintiff during that time, he did not believe her to be a viable candidate. Hugues also spoke with Woolfolk, who similarly advised that she would not recommend Plaintiff for the position.

In addition to speaking with Torchia and Woolfolk, Hugues also researched Plaintiff's performance as a pharmacy manager at the Ashley Street store. Hugues noted that Plaintiff's sales and prescription count volume were ranked

26th out of 27 stores in the district. In addition, Plaintiff's performance rating was a "C" or "competent." Based on the store metrics and the fact neither supervisor recommended her for the position, Hugues did not recommend Plaintiff for any further consideration.

The Northwest Georgia PDM position was not permanently filled at that time. Kendall Jordan, a white male and longtime District Manager for Rite Aid, served as the acting Northwest Georgia PDM beginning in July of 2009. The position was reposted in September of 2009. Plaintiff again applied for the position. Cathy Hugues was again in charge of finding suitable candidates for this position. Based on Hugues's prior knowledge of Plaintiff's performance and Plaintiff's lack of any recommendations from her supervisors, Plaintiff was not interviewed for the position.

In October of 2009, Defendant decided not to fill permanently the Northwest Georgia position until the end of the fiscal year in February 2010 because the districts would be realigned at that time. Jordan continued to handle both PDM and District Manager duties in a dual role known as a Single District Leader until February of 2010. At that time, the Northwest District was eliminated, obviating the need to select a PDM.

Torchia left the Southwest Georgia PDM position in October of 2009 to return to Defendant's newly reopened acquisitions department. Plaintiff again applied for the PDM position. Talent manager Richard Ellison was responsible for the Southwest Georgia region. Plaintiff dealt with Ellison, who did not know of

Plaintiff prior to that time, during the application process. Ellison did not speak with Torchia about Plaintiff, because he thought it inappropriate to ask Torchia to provide an opinion on his potential replacement. Instead, Ellison decided to investigate Plaintiff's performance himself and brought her in for an interview in November of 2009. Ellison and Mahdi Haquah, a PDM from Montgomery, Alabama, conducted the interview.

The interview lasted approximately two and a half hours. The participants discussed Plaintiff's interest in the position and the past performance of her store. Plaintiff acknowledged that her store's customer service scores were not as high as they should be, as hers were consistently in the 60s, and the company goal is the 80s. When asked to describe an action plan for improving her customer service scores, Plaintiff could not articulate one. Plaintiff similarly could not give a plan to improve her prescription growth rate, which was also below par and had gone down in the past year. In addition, Plaintiff's Key Performance Indicator scores were 60%, while the company goal was 80% and above. Plaintiff also stated that it would take her one year to evaluate her staff or implement any changes. In Ellison's eyes, the poor scores in combination with Plaintiff's inability to articulate a plan to improve any of them indicated a lack of leadership.

Because of Plaintiff's poor performance metrics and her inability to set forth a plan to improve them, neither Ellison nor Haquah recommended Plaintiff to Regional Pharmacy Vice President Rogers as a candidate for the position. Billy Martin, a white male, was ultimately selected for the position. Martin had

worked in retail pharmacy since 1990. From 2003 until 2008, he served as a PDM for Eckerd, CVS, and Winn Dixie.

In May of 2010, Plaintiff applied for the Southeast Georgia PDM position. Cathy Hugues was the talent manager in charge of this application process. Plaintiff was not interviewed. Hugues did not recommend Plaintiff for the position to Regional Pharmacy Vice President Rogers based upon Hugues's prior knowledge of Plaintiff's performance history and the failure of Plaintiff's previous supervisors to recommend her for the position. Further, Plaintiff's PDM at the time, Billy Martin, did not recommend her for the position either. In Martin's opinion, Plaintiff was not promotable to a PDM position because she could not grow her prescription sales and also seemed to lack initiative and leadership and business acumen.

Lawrence Ejindu, a black male, was selected for the position. At the time of his promotion, Ejindu was the pharmacy manager of store 4553 in Claxton. Ejindu has a bachelor of pharmacy degree, a post-graduate degree in management, and a master's degree in public health. His store's metrics were outstanding - at the time of his application in June of 2010, Ejindu's Overall Customer Satisfaction score was 86.21%, and both his prescription sales and prescription count were above average. Further, Ejindu's PDM, Billy Martin, gave him a very favorable recommendation. Based on his strong performance as a pharmacy manager and the favorable recommendation, Hugues recommended

Ejindu to Regional Pharmacy Vice President Rogers, and he was subsequently promoted.

Plaintiff was transferred to the Oak Street store in Valdosta in August 2010. She remained in the pharmacy manager position. The Oak Street store was a higher volume store than the Ashley Street store. Plaintiff was given the opportunity to manage a higher volume store by Martin, her PDM, in order to provide her with further experience that may have assisted her in attaining a promotion to the PDM position. However, Plaintiff's employment was terminated in September 2010. According to Defendant, Plaintiff violated company policy by leaving the pharmacy unsecured while she went to a restaurant next door to get breakfast.[6]

On December 23, 2011, Plaintiff filed a lawsuit pursuant to Title VII, 42 U.S.C. § 2000 *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* She asserted that she was discriminated against based on her race, sex, and age. She also set forth state law claims of intentional infliction of emotional distress and damage to reputation. Plaintiff sought injunctive relief, front pay, back pay, interest, fringe benefits, attorney's fees, general damages, compensatory damages, and punitive damages.

---

[6] Plaintiff disputes that she violated any policy and maintains that she secured the pharmacy when she left. It is undisputed that Plaintiff left the pharmacy on the day in question. But as addressed below, a discriminatory termination claim was not pled in Plaintiff's complaint, so it is not necessary to get into the details of the termination.

Defendant subsequently filed a motion for partial judgment on the pleadings. The Court dismissed Plaintiff's ADEA claim, along with a failure to promote claim related to Chip Stewart's promotion in February of 2009. The Court allowed Plaintiff's failure to promote claims in connection with the March 2009, June 2009, September 2009, October 2009, and May 2010 events to move forward.

Defendant has now moved for summary judgment on Plaintiff's remaining claims.

## III.   ANALYSIS

### A.   Title VII - Count I

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may prove disparate treatment through the introduction of either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." Id. at 1086 (citation omitted). "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (citation omitted). Plaintiff does not argue

there is direct evidence of discrimination present in the record. Instead, Plaintiff relies on circumstantial evidence to support her sex and race discrimination claims, which means the Court must conduct an analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

Under the McDonnell Douglas test, the plaintiff bears the initial burden of establishing a prima facie case. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). Once a plaintiff has established a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. Id. If the employer can give an appropriate explanation, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's explanation is merely a pretext. Id. A plaintiff cannot establish pretext by simply demonstrating facts that suggest discrimination, but must specifically respond to the employer's explanation and rebut it. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007). Pretext evidence is that which demonstrates "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted). When dealing with qualifications for a position, to establish pretext, a plaintiff must show "she was substantially more qualified than the person promoted." Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000) (citation omitted). "[D]isparities in qualifications must be of such weight and

significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Id. (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)).

Plaintiff asserts five separate failure to promote claims, all relating to the PDM position.[7] In order to establish a prima facie case on the basis of a failure to promote, a plaintiff must demonstrate that: (1) she belongs to a protected class; (2) she was qualified for and applied for a promotion[8]; (3) despite her qualifications, she was rejected; and (4) the position was filled with an individual outside the protected class. Vessels, 408 F.3d at 768 (citing McDonnell Douglas).[9] If Plaintiff establishes a prima facie case, the Court moves to the

_____

[7] Plaintiff complains in her deposition about not receiving a PDM position in Washington State, not receiving a clinical pharmacist position for a three-state area, and not being rehired by Defendant after her termination. These claims were not included in Plaintiff's complaint, and there is no evidence that she has exhausted her administrative remedies as to these claims. The Court will not consider these allegations at this time.

[8] While Plaintiff did not formally apply for March 2009 position that went to Torchia, the Eleventh Circuit has stated that "where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position-only that the employer had some reason to consider him for the post." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005). Looking at the evidence in the light most favorable to Plaintiff, she had indicated her interest in a PDM position prior to Torchia being promoted.

[9] There is an intracircuit split in the Eleventh Circuit as to whether the fourth element of the prima facie case for a failure to promote claim requires the plaintiff to demonstrate that the employee who received the promotion was equally or less qualified than the plaintiff.

The requirement of showing that the employee was equally or less qualified was first recognized in Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 n. 7 (11th

second and third parts of the McDonnell Douglas test. Defendant contends

Plaintiff cannot establish a prima facie case as to any of the five claims, and

further that she cannot show pretext.

Even assuming Plaintiff can establish a prima facie case for each failure to

promote,[10] she absolutely has not established pretext, making all of her claims

fail.[11] Plaintiff's argument is essentially that she was more qualified than every

_____

Cir. 1983). Prior to Perryman, Eleventh Circuit courts relied on Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980), which only required that plaintiffs demonstrate that someone outside the protected class was promoted. The Eleventh Circuit exhaustively discussed the split in Walker v. Mortham and adopted the Crawford rule under the "earliest case" principle, noting that "we have found no explanation for why the Perryman court decided to alter the prima facie case." 158 F.3d 1177, 1186-87 (11th Cir. 1998).

Despite the Walker court's instruction, courts within the Eleventh Circuit have continued to apply both Perryman and Crawford. Nevertheless, the Court finds, based on Walker's reasoning, that Crawford sets forth the appropriate test.

[10] The Court does not find as a matter of law that Plaintiff has established a prima facie case for any of the five claims. But as Plaintiff clearly cannot show pretext, the Court finds it unnecessary to parse through the prima facie test for each claim. Thus, the Court will assume without deciding that Plaintiff makes a prima facie case.

[11] Defendant has met the second part of the McDonnell Douglas test, as it has articulated legitimate, nondiscriminatory reasons for selecting the other candidates over Plaintiff. Defendant's burden on the prong is "exceedingly light;" the defendant must merely proffer a non-discriminatory reason, not prove it. Perryman, 698 F.2d at 1142. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . .It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. According to a number of different people involved in selecting the PDM candidates, Plaintiff was not qualified for the position based on her store's poor performance and her lack of leadership skills. Further, the candidates who were promoted were deemed more qualified for the position than Plaintiff based mainly on their previous management experience. Certainly a reasonable employer could be motivated not to promote an employee, or to promote others instead, based on these reasons. Chapman v. AI Transp., 229 F.3d 1012, 1030-31 (11th Cir. 2000).

person promoted to the PDM positions for which she applied.[12] For a failure to promote claim, a "plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [employee] who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race." Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (2000), *overruled on other grounds by* Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003). To rebut Defendant's reasons for promoting others than Plaintiff, she must show that the disparities between the successful applicants' and her own qualifications were of "such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004), *overruled in part on other grounds by* Ash v. Tyson Foods, 546 U.S. 454, 126 S.Ct. 1195 (2006).

Plaintiff argues that Torchia, Jordan, Martin, and Ejindu either unqualified for the PDM position, or alternatively that she was more qualified for the position. The Court disagrees with both propositions.

---

[12] To the extent Plaintiff contends Defendant's failure to post the March 2009 opening is evidence of pretext, the law in the Eleventh Circuit is clear that preselection of a candidate or a failure to post a job, even in violation of company policy, does not necessarily indicate discrimination. *See* Springer v. Convergys Customer Mgmt. Group, Inc., 509 F.3d 1344, 1350 (11th Cir. 2007) ("[E]ven where preselection violates corporate personnel policies, it does not necessarily indicate racial discrimination."); Nance v. Ricoh Elec., Inc., 381 F. App'x 919, 922 (11th Cir. 2010) ("Even if the position was not posted, however, we have held that the failure to post a job, 'even where preselection violates corporate personnel policies, . . . does not necessarily indicate racial discrimination.'"); Alexander v. Baldwin County Bd. of Educ., No. 07-0333-CB-C, 2008 WL 3551194, at *7 (S.D. Ala. Aug. 12, 2008) (preselection alone is not evidence of pretext or discriminatory intent).

Torchia is a licensed pharmacist. He has a bachelor's of pharmacy degree and a master's degree in education. He had experience working as a PDM with other companies, and had an employment history with Defendant. Jordan was a long time District Manager for Defendant who was well recognized as a strong performer. Martin had worked in retail pharmacy since 1990 and had served as a PDM for several years with other companies. Ejindu is a licensed pharmacist. He had a bachelor of pharmacy degree, a post-graduate degree in management, and a master's degree in public health, and was recognized as a strong pharmacy manager. There is nothing in the record that indicates these men were not qualified for the PDM position, either through education or experience or a combination of the two, as was permitted by the job description. Plaintiff complains that Torchia and Jordan had never been pharmacy managers with Defendant, but that was not a requirement.[13] Further, Plaintiff complains that Jordan and Martin were not pharmacists and did not have pharmacy degrees, but again, those were not job requirements.

Further, in the Court's opinion, there is nothing in Plaintiff's qualifications (bachelor and doctor of pharmacy degrees; pharmacy manager for less than two years before she applied for a PDM position; licensed pharmacist for

---

[13] Plaintiff contends that Torchia lacked the compliance knowledge required in dealing with the DEA, HIPPA, and the State Board of Pharmacy. However, there is no evidence to support that contention. Plaintiff cites to "Exhibit 2" in support, but the Court can only guess what "Exhibit 2" is. Plaintiff also attempts to attack Torchia's performance once he became the PDM, but that is irrelevant to whether or not Plaintiff was discriminated against when she did not receive the position.

approximately 20 years) that make her such a superior candidate that no reasonable person could have hired Torchia, Jordan, Martin, or Ejindu instead of Plaintiff. Both Torchia and Ejindu are licensed pharmacists with multiple degrees. Both Torchia and Martin had previous PDM experience that Plaintiff did not have. Jordan had previous district management experience that Plaintiff did not have. And Ejindu had the ability to make a store perform in a way Plaintiff could not.

Plaintiff has not met her burden to show that the disparities between her qualifications and those of Torchia, Jordan, Martin, and Ejindu were so severe that no reasonable person could have chosen them over Plaintiff. The fact Plaintiff subjectively believes she was the most qualified candidate holds no weight. *See* Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1163-64 (11th Cir. 2006) (the inquiry at the third stage of the McDonnell Douglas analysis of a failure to promote claim is not concerned with the plaintiff's belief that she was more qualified than the person hired). As stated by the Eleventh Circuit, a plaintiff "cannot prove pretext by asserting baldly that she was better qualified than the person who received the position at issue. [The plaintiff] must instead adduce evidence that the disparity in qualifications was 'so apparent as virtually to jump off the page and slap you in the face." Wilson, 376 F.3d at 1090 (quoting Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001)). The evidence presented certainly does not rise to that standard.[14]

---

[14] The fact Plaintiff was promoted to pharmacy manager in 2007 and allegedly received favorable job performance reviews has nothing to do with the case at hand. Being

As Plaintiff has not established pretext, Defendant is entitled to summary judgment on Count I of Plaintiff's complaint.

### B.   Damage to Reputation - Count II

Plaintiff claims in Count II of her complaint that she suffered harm to her reputation when she was terminated on September 3, 2010. Actions for injuries to the reputation are governed by a one-year statute of limitations. O.C.G.A. § 9-3-33. As Plaintiff did not file her lawsuit until December 23, 2011, her claim for an injury to her reputation is time-barred. Thus, Count II of Plaintiff's complaint is dismissed.

### C.   Intentional Infliction of Emotional Distress - Count III

Count III of Plaintiff's complaint alleges intentional infliction of emotional distress. Plaintiff contends that the following caused her emotional distress: (1) a negative performance evaluation from July of 2009; (2) an erroneous store visitation report filed by Bruce Norton and Dominic Torchia in April of 2009; (3) a lack of response regarding her internal complaints filed in February, July, and September of 2009; (4) not being promoted in March 2009, June 2009, September 2009, October 2009, and May 2010; (5) a bonus pay disparity when she was hired in 2006; (6) being terminated; and (7) a lack of staff in her store from 2007 until 2009.

---

qualified to manage one store pharmacy, which qualification is disputed by Defendant, in no way means or can be interpreted to mean that she was qualified to supervise multiple pharmacies and pharmacy managers. It is worth noting that there is no actual evidence in the record of these favorable evaluations other than Plaintiff's own deposition testimony.

Defendant contends that many of the actions cited by Plaintiff as supporting her IIED claim are barred by the statute of limitations. Plaintiff states in response that a four year statute of limitations is applicable to her claim. Plaintiff is wrong on this point.

> Actions for injuries to the person shall be brought within two years after the right of action accrues, except for injuries to the reputation, which shall be brought within one year after the right of action accrues, and except for actions for injuries to the person involving loss of consortium, which shall be brought within four years after the right of action accrues.

O.C.G.A. § 9-3-33.

The four year period relates to consortium claims. The law is clearly established that IIED claims under Georgia law are subject to a two-year statute of limitations. *See* Valades v. Uslu, 301 Ga. App. 885, 887-88, 669 S.E.2d 338 (2009); Risner v. R.L. Daniell & Assocs., P.C., 231 Ga. App. 750, 751, 500 S.E.2d 634 (1998); Mears v. Gulfstream Aerospace Corp., 225 Ga. App. 636, 639, 484 S.E.2d 659 (1997). Thus, any IIED claim based on an action which occurred prior to December 23, 2009 is untimely. The time-barred claims include (1) the negative performance evaluation from July 2009; (2) the erroneous store visitation report from April 2009; (3) the lack of response regarding the February, July, and September 2009 internal complaints; (4) not being promoted in March

2009, June 2009, September 2009, and October 2009; (5) the 2006 bonus pay disparity; and (6) not having additional staff.[15] Those claims are dismissed.

As for not being promoted in May of 2010 and being terminated in September of 2010, those claims fail on the merits. To recover on an IIED claim, a plaintiff must show evidence that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe. Abdul-Malik v. AirTran Airways, Inc., 297 Ga. App. 852, 855-56, 678 S.E.2d 555 (2009).

Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 856 (quoting Biven Software v. Newman, 222 Ga. App. 112, 113-114(1), 473 S.E.2d 527 (1996)) (citation and punctuation omitted). "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her sentiment against the defendant so that she would exclaim, 'Outrageous!'" Wilcher v. Confederate Packaging, Inc., 287 Ga. App. 451, 453, 651 S.E.2d 790 (2007). "Whether actions rise to the level of extreme and outrageous conduct necessary to support a claim of intentional

---

[15] One week of Plaintiff's claim about not having additional staff would survive the statute of limitations. However, the Court does not believe that Defendant's conduct in not providing staff would constitute intentional infliction of emotional distress.

infliction of emotional distress is generally a question of law." Abdul-Malik, 297 Ga. App. at 856 (citing Yarbray v. S. Bell Tel., etc. Co., 261 Ga. 703, 706(2), 409 S.E.2d 835 (1991)). "If the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress, the jury then must find the facts and make its own determination." Yarbray, 261 Ga. at 706.

In the Court's opinion, reasonable persons would not find Defendant's conduct towards Plaintiff atrocious or intolerable. The termination of an employee generally is not extreme and outrageous conduct, no matter how stressful the termination is for the employee. *See* Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993); Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992); Anderson v. Dunbar Armored, Inc., 678 F.Supp.2d 1280, 1331-32 (N.D. Ga. 2009) (termination of employee was not outrageous). And if termination is not extreme conduct, it goes to reason that not receiving a promotion is not either.

As Plaintiff has not presented evidence that Defendant engaged in extreme and outrageous conduct, Defendant is entitled to summary judgment on Count III of Plaintiff's complaint.

### D.   Retaliation

In her response to Defendant's motion, Plaintiff asserts a retaliation claim. However, the retaliation claim is not contained in Plaintiff's original complaint, and no attempt to amend the complaint was ever made. Instead, Plaintiff has

attempted to add the retaliation through her response to Defendant's motion. Plaintiff will not be permitted to raise a retaliation claim for the first time in her response brief, as this deprives Defendant of proper notice of the claim, as well as the opportunity to develop a defense. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir.2004) (A[P]laintiff may not amend her complaint through argument in a brief opposing summary judgment.@; Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir.2003) (claims not raised in a complaint cannot be raised for the first time in plaintiff's response to defendant's motion for summary judgment). Accordingly, Plaintiff's retaliation claim is dismissed.

### E.    Discriminatory Termination

Defendant states that out of an abundance of caution, it has also moved for summary judgment regarding Plaintiff's termination on September 3, 2010. However, the Court does not find it necessary to address this claim on the merits because like the retaliation claim, Plaintiff did not assert a discriminatory termination claim in her complaint. Count I is a failure to promote claim. Count II is a damage to reputation claim. Count III is an intentional infliction of emotional distress claim. Count IV is an age discrimination claim which was dismissed earlier in the case. The Court will not allow Plaintiff to insert a new claim into the

case at the summary judgment stage.[16] Thus, the discriminatory termination claim is also dismissed.

## IV.   CONCLUSION

An employer may make an employment decision for a "good reason, a bad reason,  . . . or no reason at all as long as its action is not for a discriminatory reason." Chapman, 229 F.3d at 1030 (quotation omitted). There simply is no evidence presented in this case from which a reasonable jury could find that Plaintiff was not promoted due to discrimination on the part of Defendant. Accordingly, Defendant's Motion for Summary Judgment (Doc. 28) is granted. The Clerk of Court is directed to enter judgment in Defendant's favor and close this case.

**SO ORDERED**, this the 18th day of January, 2013.

_**s/ Hugh Lawson**_
**HUGH LAWSON, SENIOR JUDGE**

mbh

---

[16] To the extent Plaintiff attempts to raise a pay disparity claim in her motion response, it too will not be considered by the Court. That claim was never raised in Plaintiff's complaint, and to raise that issue on summary judgment and present evidence on it just muddies the waters.